UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

GEOFF FOUNTAIN,

    Plaintiff,

    v.

ZIMMER INC., ZIMMER BIOMET
HOLDINGS INC RESTATED
SEVERANCE PLAN,

    Defendants.

Case No. 3:17-CV-323 JD

## OPINION AND ORDER

After he was terminated in May 2016, Plaintiff Geoff Fountain sued his former employer,

Defendant Zimmer Inc., and Zimmer Biomet Holdings Inc. Restated Severance Plan

(collectively "Zimmer Biomet") for violations under the Employee Retirement Income Security

Act ("ERISA") and for breach of contract. Zimmer Biomet filed a motion for summary judgment

on all three counts of Mr. Fountain's complaint [DE 80], which is ripe for decision. For the

following reasons, the Court grants Defendants' motion for summary judgment.

## I. FACTUAL BACKGROUND

Biomet, Inc. hired Mr. Fountain in March 2008, as a Territory Sales Manager in Biomet's

Dental Division. In July 2015, Zimmer merged with Biomet, at which point Mr. Fountain

became an employee of Zimmer Biomet. Following the merger, Mr. Fountain was promoted to

Area Sales Director in the Dental Division. Mr. Fountain reported directly to Brian Burke, who

reported directly to David Josza. In November 2015, Mr. Fountain and Zimmer Biomet executed

a Confidentiality, Non-Competition and Non-Solicitation Agreement for Sales Managers and

Representatives ("Agreement"). [DE 82-2 at 35–44]. As a full-time employee of Zimmer

Biomet, Mr. Fountain was eligible to participate in the Zimmer Biomet Holdings, Inc. Severance Plan ("Plan"). [DE 91-3]. The Plan is a self-funded ERISA plan sponsored by Zimmer Biomet that provides severance benefits to Zimmer Biomet employees who are involuntarily terminated "for reasons other than misconduct or cause" and meet the Plan's eligibility conditions. *Id.* at 6–8. The Administrative Committee ("Committee") is the Plan's administrator. *Id.* at 12.

Between 2010 and 2013, the company's policy was that employees were no longer permitted to, and were prohibited from, organizing or paying for entertainment-related activities such as golfing with healthcare providers. This change was "a major shit" in policy to comport with applicable federal laws and regulations on the topic. [DE 82-3 at 9–10]. Mr. Fountain was aware of this policy and knew it was something he was expected to follow on a daily basis, and he knew violating the policy had repercussions. [DE 82-8 at 3]. Employees were permitted to attend entertainment or recreational activities arranged by healthcare providers if everyone paid their own expenses. [DE 82-3 at 11, 13]. However, the policy only permits such activities to occur "infrequently" to "avoid even the perception of any improper conduct," explains that any entertainment-related expenses were not reimbursable by Zimmer Biomet, and employees had to retain their receipts to prove they only paid their own expenses. [DE 82-2 at 102]. Additionally, business meetings "must be held in locations that are conducive to the exchange of professional information and knowledge" which do not include "[g]olf courses and other recreational settings." *Id.* at 101–02. In November 2013, the policy changed, and employees were prohibited from participating in recreational or entertainment activities including golfing with healthcare providers, regardless of who paid the expenses. *Id.* at 124. Employees who violate the policy were subject to termination. *Id.* The Global Policy on Business Courtesies for HCPs and Public Officials, effective February 2016, "strictly prohibits arranging or paying for entertainment or

recreational activities for HCPs . . . include[ing] sporting events, theater, leisure trips, golf, and other recreational activities." [DE 82-2 at 6].

On January 7, 2016, Mr. Fountain emailed Mr. Burke seeking his signature on a draft letter addressed to the Internal Revue Service. The letter stated in part:

> The following describes [Biomet's] reimbursement policy for Mr. Fountain during the calendar year of 2013.
>
> [. . .]
>
> 2. Mr. Fountain was not reimbursed for entertainment related expenses such as skiing, golfing or fishing events with clients. He was not reimbursed for any food or alcohol expenditures incurred in connection with these entertainment activities.
>
> 3. Mr. Fountain was not reimbursed for any business related alcohol only expenditures.

[DE 82-4 at 8; 91-5 at 5]. Mr. Fountain told Mr. Burke he needed the letter signed because he was being audited by the IRS. [DE 91-5 at 3–4]. Mr. Burke informed Mr. Fountain that he could not sign a legal document on behalf of the company without legal approval. *Id.* at 2. Mr. Burke felt this letter "drew a red flag" given the polices prohibiting such activities. [DE 82-4 at 15]. Mr. Burke forwarded the letter to Lisa Anderson in human resources, indicating he was "not keen on signing what [Mr. Fountain was] requesting." [DE 91-5 at 1]. Mr. Burke also asked corporate counsel Neeta Toprani to look into the letter. [DE 82-4 at 9].

On January 12, Ms. Toprani informed Michael Henry, Compliance Director for Zimmer Biomet's North America Dental Division, that, based on the IRS letter he sent to Mr. Burke, Mr. Fountain appeared to have entertained healthcare providers and Ms. Toprani requested an investigation of whether Mr. Fountain violated company policy regarding such activities. [DE 68-8 at 4–5, 14–15, 16, 17–18]. That same day, Mr. Henry notified Michael Pacella, Zimmer Biomet's Vice President of Global Compliance Operations & Investigation, of Mr. Fountain's

potential policy violation. Three days later, Mr. Pacella directed Mr. Henry to investigate Mr. Fountain's misconduct since the IRS letter seemed to indicate he incurred expenses entertaining clients that were not reimbursed by the company and they needed to advise Zimmer Biomet on whether a compliance violation occurred and make a recommendation for actions, as appropriate. *Id.* On February 29, Mr. Burke reported concerns about Mr. Fountain's conduct to human resources, particularly playing golf with healthcare providers during a conference in San Diego. [DE 82-4 at 19–20].

On March 1, Mr. Fountain met with Mr. Josza and explained that he had a job offer with competitor Southern Implants ("SINA") and wanted to discuss negotiating a separation from Zimmer Biomet that would allow him to accept the position without violating the non-compete provisions of his Agreement. [DE 1 ¶¶ 22–24; 82-7 at 7; 82-8 at 4–6]. Within a few days of this meeting, Mr. Fountain was interviewed about his entertainment activities with healthcare providers by Mr. Henry and Ms. Toprani over the phone. [DE 82-8 at 17–18]. During that interview, Mr. Fountain told Mr. Henry he played golf at the San Diego conference with "at least two healthcare providers." *Id.* at 19–20. Mr. Henry asked Mr. Fountain if he had the receipts to substantiate that he only paid for his own expenses, to which Mr. Fountain answered that he did not know if he had receipts. *Id.* 24–25. Mr. Fountain testified that he viewed these golf outings as business meetings, which justified submitting them on his tax returns as a business expense. *Id.* at 22. Mr. Fountain never looked for the receipts for his entertainment expenses. *Id.* at 25.

Mr. Pacella completed the investigation on or before April 27 [DE 68-8 at 27] and detailed his findings and conclusions in a memorandum to Ms. Anderson dated May 5, 2016 [DE 82-10 at 3–4]. Mr. Pacella concluded that the investigation "substantiated the allegations that Mr. Fountain violated Company policy by entertaining [healthcare providers]" and based on "(1) Mr.

Fountain's own admissions; (2) the evidence uncovered during its investigation related to HCP entertainment; (3) Mr. Fountain's refusal to cooperate with the investigation; and (4) the Company's failure to find Mr. Fountain's denials credible" recommended Mr. Fountain be terminated for cause. *Id.* On May 6, Mr. Fountain was terminated. [DE 91-12]. In his termination letter, Mr. Fountain was notified that because his employment was terminated for willful misconduct or activity deemed actually or potentially detrimental to the interests of Zimmer Biomet, he was not eligible for severance benefits under the terms of the Plan. *Id.* at 2. Mr. Fountain was notified of his right to appeal the denial of benefits and request a copy of the administrative record. *Id.* On May 30, 2016, Mr. Fountain received an employment offer letter from SINA, which made the offer contingent on Mr. Fountain's ability to abide by the terms of the Agreement with Zimmer Biomet and SINA reserved the right to rescind the job offer if it concluded the Agreement would impair Mr. Fountain's ability to perform the job. [DE 91-14 at 4]. In June 2016, Mr. Fountain became a consultant for SINA, working outside the United States. [DE 82-8 at 31–35].

On June 10, counsel for the Committee responded to Mr. Fountain's request for the administrative record by sending the record to date, which included Mr. Pacella's May 5 memorandum. [DE 82-8 at 36–37]. Mr. Fountain retained counsel to prepare and present his appeal, which was submitted to the Committee on July 5 and supplemented on July 29. [DE 82-2 at 30–79, 168–70]. The Committee met to review Mr. Fountain's initial submission and then met again after he supplemented his appeal. During the meetings, the Committee members discussed the appeal and only reviewed the administrative record before them, and no other information or documents. [DE 82-1 at 5–9]. The Committee voted to deny Mr. Fountain's appeal and the denial letter, dated September 19, 2016, explained in detail the arguments and evidence provided

in Mr. Fountain's appeal, the Plan terms, and the reasons for the denial. *Id.* at 8; [DE 82-2 at 172–75].

On April 28, 2017, Mr. Fountain initiated this lawsuit by filing a complaint. [DE 1]. Zimmer Biomet now moves for summary judgment on all his claims. [DE 80].

## II. STANDARD OF REVIEW

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of [a] genuine issue of material fact." *Id.* at 323. Once the moving party meets this burden, the nonmoving party may not rest on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). The disputed facts must be *material*, which means that they "might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, No. 4:08-CV-69, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010). And relevant to claims addressed in this opinion, "[i]f the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary

judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996).

### III. DISCUSSION

Mr. Fountain's complaint includes three counts. Count I asserts a violation of ERISA for wrongfully denying Mr. Fountain's claim for severance benefits under the Plan. Count II asserts that Zimmer Biomet discriminated against Mr. Fountain for the purposes of interfering with his attainment of severance and other benefits under the Plan. Lastly, Count III asserts that Zimmer Biomet breached its Agreement with Mr. Fountain when it did not pay non-competition period payments after he was denied employment at a competing company. Zimmer Biomet moves for summary judgment on all counts and the Court addresses each in turn.

#### A. Count I – Wrongful Denial of Benefits

Mr. Fountain asserts in Count I of his complaint that Zimmer Biomet involuntarily terminated him for reasons other than misconduct or cause and therefore the Committee wrongfully denied his severance and other benefits to which he is entitled under the terms of the Plan. [DE 1 ¶¶ 52–54]. Count I is brought under ERISA. The first question in analyzing an ERISA claim is what standard of review applies to the plan administrator's denial of Plaintiff's benefits. "Judicial review of an ERISA administrator's benefits determination is de novo unless the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). However, where an ERISA plan vests such discretion in the administrator, "the court applies a more deferential standard, seeking to determine only whether the administrator's decision was 'arbitrary and

capricious.'" *Id.* (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860–61 (7th Cir. 2009)).

Though review under this deferential standard does not turn a court into a "rubber stamp," *id.*, a plan administrator's interpretation will only be overturned when it is "unreasonable, and not merely incorrect," *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 329 (7th Cir. 2000); *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) ("Put simply, an administrator's decision will not be overturned unless it is downright unreasonable.") (internal quotations omitted). Thus, an administrator's decision will be upheld "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (internal quotations omitted). In assessing a case under the arbitrary and capricious standard of review, the Court may take into account four factors: "the impartiality of the decisionmaking body, the complexity of the issues, the extent to which the decisionmakers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir. 1995).

There is no dispute that the Plan expressly vests such discretionary authority in the Plan Administrator, which here, is the Committee. [DE 91-3 at 12 ("To the fullest extent permitted by law, the plan administrator will have the discretion to determine all matters relating to eligibility, coverage and benefits under the Plan."); 83 at 3–4; 90 at 22–23]. Zimmer Biomet argues summary judgment on Count I is appropriate because the Committee's decision reasonably concluded the reason for his termination rendered him ineligible under the Plan and accordingly

was not arbitrary and capricious. Mr. Fountain argues his denial of benefits was arbitrary and capricious because the Plan's procedures are so deficient that they call into question the integrity of the decision to deny his severance benefits for the following reasons: 1) failing to provide Mr. Fountain the evidence the Committee relied upon to determine that he was not eligible for severance benefits; 2) delegating the Committee's fiduciary authority; and 3) operating under a conflict of interest.

First, Mr. Fountain argues that based on the information set forth in the Committee's decision affirming the denial of benefits, it is clear that the administrative record provided to him is devoid of evidence purportedly relied upon by the Committee to deny his claim for benefits. The Committee's decision references the compliance investigation, including a review of emails. [DE 82-2 at 172 ("As part of its investigation, the Company determined that: Mr. Fountain admitted that he frequently participated in entertainment with [healthcare providers] including skiing, golfing and fishing, albeit for business purposes. This activity was supported by a review of Mr. Fountain's emails.")]. However, there are no documents in the administrative record, nor were any provided to Mr. Fountain prior to the administrative appeal, that were reviewed during the investigation, including the emails referenced. Mr. Fountain also notes that Zimmer Biomet's Code of Business Code and Ethics is referenced in both the May 5 memorandum and the Committee's decision, however it was not in the administrative record. Mr. Fountain also argues that the Committee found that he entertained healthcare providers more than "infrequently," but did not provide documentation how it arrived at this conclusion. Lastly, Mr. Fountain asserts that the Committee's skepticism of a lack of receipts provided by Mr. Fountain in support of his argument was misplaced because the Committee never asked for such records. Mr. Fountain

concludes that because of these omissions, he was unable correct the record, point out errors, or otherwise support his case during the review process.

The Court does not find that these undisputed facts deem the Committee's decision arbitrary and capricious. By making the assertion that the Committee failed to "show how it arrived at [its] finding" regarding the conclusion Mr. Fountain entertained healthcare providers more than "infrequently" or why it was skeptical that Mr. Fountain did not have records to support his argument, Mr. Fountain attempts to impose an obligation on the Committee not required under ERISA or the Plan. A plan administrator's decision must give specific reasons for the denial of benefits under ERISA. 29 U.S.C. § 1133(1). However, "that is not the same thing as the reasoning behind the reasons" or "the interpretive process that generated the reason for the denial." *Rabinak v. United Bhd. of Carpenters Pension Fund*, 832 F.3d 750, 755 (7th Cir. 2016) (internal quotations and citations omitted). The critical element is that the reason given is a sufficient explanation to allow the participant to "formulate his further challenge to the denial." *Id.* The Committee's denial did so here, and Mr. Fountain was aware of the issues with his conduct and he has formulated well-developed arguments from the moment he initiated his administrative appeal and throughout this litigation.

Mr. Fountain points to the fact that the Committee references a review of his emails and Zimmer Biomet's Code of Business Code and Ethics but did not include these documents in the administrative record. The Committee is only required to produce documents "relied upon in making the benefit determination" or that were "submitted, considered, or generated in the course of making the benefit determination." *Tompkins v. Cent. Laborers' Pension Fund*, 712 F.3d 995, 1000 (7th Cir. 2013) (finding ERISA plaintiff's assertion of bad faith over administrator's non-disclosure of additional documents not considered by the administrator when

10

denying request for benefits to be "meritless" since there was no obligation to disclose every document that might be available to administrator); 29 C.F.R. § 2560.503–1(j)(3). *See also* [DE 82-2 at 21]. Here, it is undisputed that the Committee did not review or consider any evidence outside the administrative record. During her deposition, Karen Monroe, a member of the three-person Committee who decided Mr. Fountain's administrative appeal, testified that the administrative record contained everything the Committee considered in deciding Mr. Fountain's appeal. [DE 82-1 at 7]. Mr. Fountain does not dispute this. Accordingly, the Court finds the Committee's decision is rationally supported by the administrative record and is not arbitrary and capricious.

Second, Mr. Fountain argues, without citing legal authority, the Committee unlawfully delegated its fiduciary duty by solely relying upon Mr. Pacella's May 5 memorandum and Zimmer Biomet's compliance investigation in making its determination to deny Mr. Fountain severance benefits. However, the Committee did not solely rely on what was submitted by Zimmer Biomet. Mr. Fountain was given the opportunity to submit his own evidence and arguments, which he did on two occasions. As explained in its decision, the Committee also considered Mr. Fountain's initial and supplemental submissions. [DE 82-2 at 173 ("As noted, the appeal consists of your letters dated July 5th and July 29th, the latter supplementing the original appeal to respond to the Company policies that I sent you. . . . The Administrative Committee evaluated the positions of the Company and Mr. Fountain.")]. Mr. Fountain does not appear to dispute that his submissions and other documents were considered by the Committee, which cuts against this argument. He notably does not cite any authority requiring plan administrators to independently review and analyze the adequacy of every conclusion and submission to the administrative record. *See Rubber Shop v. Benicorp Ins. Co.*, 238 F.R.D. 618, 622 (N.D. Ind.

2006) ("[T]he failure to consider or generate evidence that is favorable to the claimant also does not render a plan administrator's decision arbitrary and capricious." ); *see also Davis*, 444 F.3d at 576 (indicating that it was not arbitrary and capricious for fiduciary to rely on only in-house doctors).

Additionally, the Committee considered what was absent from the record before them— receipts or records supporting Mr. Fountain's claims that he only paid for his own golf expenses. [DE 82-2 at 174–75]. The Committee noted that these records would have demonstrated whether Mr. Fountain paid for any healthcare provider activity and how frequently such activities occurred. *Id.* The record also included the draft letter Mr. Fountain requested Mr. Burke to sign for the IRS explaining his non-reimbursed entertainment related expenses, the policies Zimmer Biomet found that Mr. Fountain violated, and Mr. Fountain's own admissions to golfing with healthcare providers. [DE 82-2 at 33, 45, 50–71, 81–166]. Accordingly, the Court finds that it is undisputed that the record the Committee considered included more evidence than just Mr. Pacella's May 5 memorandum and Zimmer Biomet's compliance investigation, and therefore Mr. Fountain's delegation of fiduciary duty argument fails.

Third, Mr. Fountain argues that a conflict of interest is created when a plan administrator both *evaluates* and *pays* claims for benefits and such conflict must be weighed when considering whether an abuse of discretion has occurred. A conflict of interest, one of several different considerations when a court reviews the lawfulness of benefit denials, "will act as a tiebreaker when the other factors are closely balanced." *Metro. Life*, 554 U.S. at 117. "The mere existence of a conflict, however, is not justification for heightening the level of scrutiny, either on its own or by enhancing the significance of other factors." *Id.* at 123. The existence of a conflict of interest, "which is a given in almost all ERISA cases," is less critical than the *gravity* of the

conflict. *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009). Mr. Fountain points to no other specific evidence other than the Committee being comprised of Zimmer Biomet employees, which he argues creates a disincentive to award severance benefits to participants in the Plan. *See Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998) (presuming administrator that decides and pays benefits acts neutrally unless a claimant provides "specific evidence of actual bias that there is a significant conflict"). Mr. Fountain does not identify any actual bias or significant conflict nor does the Court find one. As explained below, the Committee's decision was reasonable and supported by the administrative record before it. Additionally, there is no indication in this case that the Committee "labored under a conflict of interest serious enough to influence his decision consciously or unconsciously—a decision that was otherwise entirely reasonable—decisively." *Marrs*, 577 F.3d at 789.

On the whole, there is simply no basis for concluding that the administrator acted arbitrarily or capriciously because the Committee's decisions to uphold the original denial of severance benefits under the Plan is reasonable and there is rational support in the administrative record for its conclusion. "[Q]uestions of judgment and management are to be left to the administrator in this situation. The judicial task here is not to determine if the administrator's decision is correct, but only if it is reasonable." *Davis*, 444 F.3d at 576–77. Under the Plan here, an employee is ineligible for severance if his employment is terminated for various enumerated reasons, including:

> Willful misconduct or activity deemed actually or potentially detrimental to the interests of the Company, which may include, but is not limited to, dishonesty; . . . violation of one or more Company policies . . . conduct inconsistent with any applicable law or regulation; or other serious misconduct; [or]

> Any act or omission causing, or having potential to cause, significant harm or loss to the Company, its officers and/or employees[.]

[DE 91-3 at 7]. There is ample support in the administrative record before the Committee to conclude that Mr. Fountain was terminated for one or more of the above reasons, due to his conduct violating company policy relating to healthcare provider entertainment, therefore making him ineligible for severance. The administrative record included a detailed summary of Mr. Pacella's compliance investigation, which ultimately led to the decision to terminate Mr. Fountain, including the fact that Mr. Fountain requested Zimmer Biomet to sign a letter to the IRS explaining his non-reimbursed entertainment related expenses. Zimmer Biomet found this as a de facto admission he participated in entertainment with clients for business purpose. [DE 82-2 at 78]. The record also includes the policies Zimmer Biomet found that Mr. Fountain violated through the regular arrangement or participation in entertainment activities with healthcare providers, the draft of the IRS letter, and Mr. Fountain's own admissions to golfing with healthcare providers in February 2016. [DE 82-2 at 33, 45, 50–71, 81–166]. As noted in Zimmer Biomet's decision to terminate Mr. Fountain and the Committee's decision upholding the denial of benefits, the absence of receipts or records supporting Mr. Fountain's assertion that he paid for his own expenses and not the expenses of healthcare providers is also reason supporting both decisions. As particularly noted in the Committee's decision, the 2010 policy required employees to maintain documentation to prove that each person paid for their own expenses. [DE 82-2 at 174]. Based on the administrative record before the Committee, Mr. Fountain did not submit these necessary receipts. The Committee's decision itself offers a reasoned explanation, based on the evidence, for the denial of Mr. Fountain's benefits and is far from "downright unreasonable." *See Davis*, 444 F.3d at 576. Accordingly, the

Committee's decision will not be disturbed because it is not arbitrary and capricious, and the Defendants' motion for summary judgment is granted as to Count I of Mr. Fountain's complaint.

### B. Count II – Intentional Interference with Benefits

In Count II, Mr. Fountain asserts that Zimmer Biomet terminated his employment to interfere with his right to obtain severance and other benefits under the Plan, in violation of ERISA. Under § 510 of ERISA, it is "unlawful for any person to discharge . . . [a participant] for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. "Nevertheless, an employee's loss of benefits due to an adverse employment action does not automatically amount to a violation of § 510." *Turner v. Health Care Serv. Corp.*, 2009 WL 1210624, at *16 (N.D. Ill. May 4, 2009) (citing *Isbell v. Allstate Ins. Co.*, 418 F.3d 788 (7th Cir. 2005)). Rather, "[t]he employer must have the specific intent to deprive an employee of his plan rights." *Isbell*, 418 F.3d at 796; *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1996).

To establish a violation of § 510, Mr. Fountain must show that Zimmer Biomet terminated him with the specific intent to interfere with his ERISA rights. *See Teumer v. Gen. Motors Corp.*, 34 F.3d 542, 550 (7th Cir. 1994); *Meredith v. Navistar Int'l Transp. Co.*, 935 F.2d 124, 126 (7th Cir. 1991). Mr. Fountain may satisfy this burden by using the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Isbell*, 418 F.3d at 796; *Grottkau v. Sky Climber, Inc.*, 79 F.3d 70, 73 (7th Cir. 1996); *Little v. Cox's Supermarkets*, 71 F.3d 637, 642 (7th Cir. 1995); *Meredith*, 935 F.2d at 127. Under the burden-shifting analysis, on which Mr. Fountain seemingly relies, a plaintiff must first make out a prima facie case by showing that he (1) belonged to the protected class; (2) was qualified for his position; and (3)

was discharged "under circumstances that provide some basis for believing that the prohibited intent to retaliate or to prevent the use of benefits was present." *Isbell*, 418 F.3d at 796 (internal quotation omitted). The burden would then shift to Zimmer Biomet to articulate a "legitimate, nondiscriminatory reason for its action," which Mr. Fountain would then need to rebut as pretextual. *Id.*; *Little*, 71 F.3d at 642. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . . . Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

In opposing summary judgment on this claim, Mr. Fountain fails to make a prima facie case that some basis for believing that the prohibited intent was present. Mr. Fountain summarily states that Zimmer Biomet's reason for interfering with his right to obtain severance benefits was because "[Zimmer Biomet] knew that Fountain was not going to resign his employment." [DE 90 at 16]. Mr. Fountain has not produced any evidence that supports this speculation. Instead, Mr. Fountain skips right to arguing that Zimmer Biomet's reason for firing was pretextual. He argues that there is evidence from which a reasonable factfinder could conclude that Zimmer Biomet's asserted reason for his termination was false. He argues the evidence shows that 1) Zimmer Biomet changed the explanations that it has given to justify his termination; 2) the compliance investigation was a sham; 3) ambiguous statements from Zimmer Biomet employees infer discriminatory intent; and 4) Zimmer Biomet did not uniformly apply its entertainment policy. *Id.* at 17. However, the Court can skip ahead in the analysis. It "need not determine whether a plaintiff has established a prima facie case where a defendant has advanced a legitimate, nondiscriminatory reason for its action." *Isbell*, 418 F.3d at 796 (internal quotations

omitted). "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *Lindemann*, 141 F.3d at 296 (internal citations omitted). Accordingly, because Zimmer Biomet's briefing addresses Mr. Fountain's pretext arguments and produces a legitimate, non-discriminatory reason for terminating Mr. Fountain, namely his violation of company policies, the Court skips over the prima facie case to consider whether or not Mr. Fountain has carried his burden of showing that Zimmer Biomet's stated reason for his termination is false and pretextual.

Pretext is not established when the plaintiff merely demonstrates the employer's reason was mistaken. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). "An employer's mistaken belief . . . is not unlawful, so long as the belief was honestly held." *Id*. (citing *Wade v. Lerner N.Y. Inc.*, 243 F.3d 319, 323 (7th Cir. 2001)). A pretext is a deliberate falsehood; a lie, and not an oddity or error. *Id*. "[T]o meet [his] burden, [the plaintiff] 'must identify such weaknesses, implausibilities, inconsistencies, or contradictions' in [Zimmer Biomet's] stated reason 'that a reasonable person could find [it] unworthy of credence.'" *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). Moreover, Mr. Fountain must show that the stated reason was a lie covering for Zimmer Biomet's alleged true motive: terminating Mr. Fountain with the specific intent to deprive him of ERISA benefits. *See Nauman v. Abbott Labs.*, 669 F.3d 854, 857 (7th Cir. 2012) (plaintiffs claiming violation of § 1140 "must demonstrate that their employers [acted] with the specific intent of preventing or retaliating for the use of benefits.").

First, Mr. Fountain asserts that Zimmer Biomet offered three shifting or inconsistent explanations for his termination in Mr. Pacella's May 5 memorandum and the May 6 termination

letter, the May 10 Zimmer Consolidated Hotline and Investigations, and the Defendant's motion for summary judgment. The Court finds that any differences in the exact language used between explanations for termination are not so inconsistent in the conveyed reasoning as to conclude a reasonable juror could infer pretext. The May 5 memorandum stated his termination was due to his violation of company policies and the result of "Mr. Fountain's refusal to cooperate with the investigation." [DE 82-10 at 4]. The May 6 termination letter stated that his termination was the result of violating company policies and because he "refused to cooperate in the investigation when asked to provide copies of expense documentation related to these activities." [DE 91-12 at 2]. Mr. Fountain argues the May 10 Zimmer Consolidated Hotline and Investigations Summary is inconsistent with the May 5 memorandum and May 6 termination letter. The summaries Mr. Fountain is referring to are in a spreadsheet providing details of the investigation, particularly in a column titled "Investigation Comments." [DE 91-23 at 25–26, 30–33]. There are three entries in these Investigation Comments regarding the investigation into Mr. Fountain, initiated on January 15, 2016. The first Investigation Comment "as of April 11, 2016" states, in relevant part:

> Document review has been completed and initial interview were conducted the week of February 8 during which the allegations of Team Members paying for HCP entertainment were denied, but during his interview Geoffrey Fountain said he would not provide receipts that would corroborate his denial. [Global Compliance Investigations] to meet with Legal and Dental Leadership to discuss next steps and possible remediation.

*Id.* at 26. The second Investigation Comment "as of May 10, 2016" states, in relevant part:

> A document review was completed which did not evidence any documents affirming Fountain paid for HCP entertainment expenses, however Fountain was uncooperative with the investigation and failed to offer document evidence that would prove he did not pay for HCP entertainment after claiming it existed. . . . [T]he business has indicated they do not want to continue an employment relationship with Fountain in light of his uncooperative behavior and other persisting issues with his business ethics."

*Id.* at 31. The third Investigation Comment, also "as of May 10, 2016" states, in relevant part:

> A document review was completed which did not evidence any documents affirming Fountain paid for HCP entertainment expenses, though it did find documents confirming that Fountain arranged such entertainment. Fountain was also uncooperative with the investigation and failed to offer documentary evidence that would prove he did not pay for HCP entertainment after claiming it existed. [Global Compliance Investigations] recommended that Fountain be terminated, which occurred on May 6.

*Id.* at 33. Mr. Fountain argues "failed to offer document evidence" (stated in the May 10 Investigation Comments) is inconsistent with "Mr. Fountain's refusal to cooperate with the investigation" (May 5 memo) and "refused to cooperate in the investigation when asked to provide copies of expense documentation related to these activities" (May 6 termination letter). The Court does not find whether Mr. Fountain failed to offer receipts to Zimmer Biomet or whether Zimmer Biomet requested them, and he refused to provide them, to create the inconsistency that would reasonably rise to an inference of pretext. All three explanations indicate that Mr. Fountain never produced receipts supporting his claims, which is undisputed. Further, while Mr. Fountain characterizes these summaries as being "altered," however, Zimmer Biomet has indicated that these are status updates which were updated monthly as the investigation progressed. [DE 96 at 12 n.6].

Mr. Fountain makes two additional arguments regarding these Investigation Comments. First, he argues that the business' desire to "not want to continue an employment relationship with Fountain in light of his uncooperative behavior and other persisting issues with his business ethics," found in the second Investigation Comment, infers that Mr. Fountain's termination had nothing to do with violating company policy. The Court does not find that this entry infers that conclusion. The Investigation Comment as a whole is self-explanatory and read together, is clear that Mr. Fountain's failure to provide evidence he did not pay for healthcare providers' entertainment expenses stemming from the IRS audit is directly related to his violating company

policy as the basis for his termination. Second, he argues that the May 10 Investigation Comments were revised to include that he "failed to offer documentary evidence that would prove he did not pay for HCP entertainment after claiming it existed" from the first Investigation Comment which stated "he would not provide receipts that would corroborate his denial." [DE 90 at 18]. However, the Court once again does not find that this variation of documenting the progress of the investigation can be reasonably inferred as pretext.

All of these descriptions mean the same thing—Mr. Fountain did not provide Zimmer Biomet with any receipts or evidence that established he paid for himself, and only himself, on the occasions he golfed with healthcare providers and the investigation into his entertainment of healthcare providers led to his termination.[1] These slight differences or variances in labels used to describe Mr. Fountain's misconduct are insufficient to establish pretext nor do their differences rise to a level of inconsistency that permits an inference of a discriminatory motive. *See Grottkau*, 79 F.3d at 73 (affirming summary judgment for employer on interference claim and rejecting assertion that omissions in termination letter or investigation constituted pretext); *Little*, 71 F.3d at 643 (affirming summary judgment for employer and noting "theft" and "concealment" are merely labels of the same conduct and do not establish pretext or an inference that "impermissible concerns motivated [the] employment decision").

Lastly, Mr. Fountain argues the Defendants' motion for summary judgment contends he was terminated because he violated the company policy regarding the entertainment of healthcare providers in relation to the 2013 IRS audit and the Academy of Osseointegration

---

[1] At his deposition, Mr. Fountain was asked on numerous occasions why he did not submit receipts either after his meeting with Mr. Henry or during his appeal of his denial of benefits after his termination. Mr. Fountain's provided the same reasoning after each inquiry—no one ever asked him to provide those receipts. [DE 82-8 at 25, 28–30, 38–39, 41–43]. He also testified that he never looked for the receipts. *Id.* at 25. He also testified he did not think it would have changed Zimmer Biomet's decision even if he had submitted receipts, however the Court finds no evidence in the record to support such an assertion. *Id.* at 42.

meeting. [DE 90 at 18 (citing to Defendants' Memorandum in Support of Their Motion for Summary Judgment, DE 83 at 10)]. The cited page of Zimmer Biomet's motion references Mr. Burke's email to Ms. Anderson reporting Mr. Fountain's misconduct in San Diego. This argument also fails as the Defendants' were simply noting a piece of evidence and its timing in support of its argument that the investigation that led to Mr. Fountain's termination was initiated well before Mr. Fountain's meeting with Mr. Josza regarding his employment offer with a competitor. The Defendants' motion for summary judgment does not offer an inconsistent explanation for Mr. Fountain's termination. Accordingly, the Court finds that Mr. Fountain has not carried his burden establishing that Zimmer Biomet's explanations for his termination is pretext of intent to interfere with his severance benefits and his argument fails.

Second, Mr. Fountain argues that the compliance investigation initiated against him was a "sham investigation" and is evidence of pretext. Mr. Fountain argues that Zimmer Biomet produced conflicting documentation (the Investigation Comments) from which a reasonable factfinder could infer the facts relating to Mr. Fountain's receipts were fabricated or mispresented. Mr. Fountain asserts because the Investigation Comments changed from "would not provide receipts that would corroborate his denial" (April 11) to "failed to offer document evidence that would prove he did not pay for HCP entertainment" (May 10), a reasonable inference can be made that Mr. Henry did not ask Mr. Fountain to provide such information. However, as discussed above, the Court does not find the Investigation Comments inconsistent with the reasoning provided for Mr. Fountain's termination. Whether Mr. Fountain was asked to provide receipts by Mr. Henry or not does not create a material fact in dispute nor does it make the investigation a sham. What is not in dispute is that Mr. Henry at the very least asked Mr. Fountain whether he had receipts to substantiate his claim he only paid for himself and no

receipts were provided to Zimmer Biomet. Also, what is not in dispute is the fact that he did golf with healthcare providers and never submitted the receipts to support his assertion he paid for himself only. These facts are consistent with the reason for termination offered in the Investigation Comments, the May 5 memorandum, the May 6 termination letter, and ultimately, the Committee's denial of his severance benefits.

Mr. Fountain goes on to argue that a reasonable factfinder could infer that Zimmer Biomet is fabricating, ignoring, or misrepresenting the information contained in Mr. Fountain's 2013 emails. Zimmer Biomet asserted that a sampling of emails reviewed by the compliance investigator corroborated that Mr. Fountain entertained healthcare providers more than frequently. However, again, the Court does not find any evidence to suggest that the investigation, or the review of his emails, was a sham. First, Mr. Fountain does not dispute the evidence that led to the opening of the compliance investigation against him. He does not deny that he sought Mr. Burke's signature on behalf of Zimmer Biomet on a draft letter for the IRS describing the company's reimbursement policies, particularly that he was "not reimbursed for entertainment related expenses such as skiing, golfing or fishing events with clients." [DE 91-5]. He does not dispute the fact that Mr. Burke told him he needed in-house legal counsel's approval before signing the letter nor does he dispute that Mr. Burke emailed the letter to human resources and notified legal counsel. Just a few days later, a compliance investigation was opened to investigate whether Mr. Fountain violated the company's policy, as the IRS letter indicated he spent money entertaining clients. Further, the 2013 emails before the Court do indicate his involvement in planning golf with healthcare providers. [DE 91-23 at 8–24]. Additionally, the investigation was conducted by a department whose sole purpose is to investigate compliance violations within the company. Mr. Fountain being the only person interviewed in the

investigation does not lead to a reasonable inference that the investigation was a sham considering there is "ample undisputed evidence to show conclusively that the investigation was not a sham." *Grottkau*, 79 F.3d at 73 (finding the undisputed record evidence concludes the investigation into plaintiff's conduct was not a sham). Lastly, in order to establish it was a "sham investigation, Mr. Fountain "must offer evidence tending to show that [Zimmer Biomet] did not actually believe the findings of the investigation" including by showing that "a reasonable person could find [it] unworthy of credence." *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864–65 (7th Cir. 2015) (internal quotations and citations omitted). Mr. Fountain has failed to provide the Court with evidence that Zimmer Biomet did not actually believe the findings of its investigation nor did he establish that the investigation was unworthy of credence.

Third, Mr. Fountain argues there is evidence of "ambiguous oral statements and other bits and pieces from which an inference of discriminatory intent might be drawn." [DE 90 at 20–21]. On March 1, 2016, Mr. Fountain met with Mr. Josza regarding several issues concerning his employment at Zimmer Biomet and that he had a job opportunity with SINA and wanted Mr. Josza's blessing to pursue it. [DE 91-1 at 8]. Mr. Fountain told Mr. Josza he was not resigning but wanted to discuss whether the job opportunity would conflict with his non-competition Agreement and whether he could re-negotiate new terms. *Id.* at 9. Shortly after the meeting with Mr. Fountain, Mr. Josza learned that on the same day of their meeting, Mr. Fountain and a SINA employee took another Zimmer Biomet employee out for a recruiting dinner regarding SINA. [DE 91-16 at 32–35]. During his deposition, Mr. Josza testified that in the interest of the company, he "didn't really appreciate" the recruiting dinner and it made him "rethink how supportive [he] would be of [Mr. Fountain's] request for a reduction in his [non-compete]

terms." *Id.* at 34–35. On March 3, 2016, Mr. Fountain had the meeting with the compliance officer Mr. Henry and legal counsel Ms. Toprani.

Mr. Fountain argues that a reasonable factfinder could conclude that Mr. Josza wanted Mr. Fountain terminated because he knew Mr. Fountain would not resign and tried to help SINA recruit another Zimmer Biomet employee. First, as noted by Zimmer Biomet in its reply, Mr. Fountain appears to have abandoned the theory in his Complaint that Mr. Josza and Mr. Burke made a false report to the compliance department to have Mr. Fountain investigated after he disclosed the job opportunity with a competitor during the March 1 meeting. [DE 1 ¶ 26]. Mr. Fountain does not dispute that the compliance investigation was initiated six weeks prior to his March 1 meeting with Mr. Josza. Mr. Fountain speculates that Mr. Josza knew that if Mr. Fountain was terminated with cause, he would lose a lot of his benefits, including severance benefits. However, Mr. Fountain mischaracterizes the evidence. When asked if he understood that due to the alleged reason for Mr. Fountain's termination, he would not be eligible to receive any severance benefits, Mr. Josza testified "[n]o, [he] wasn't privy to that at the time" but learned it subsequently and stated it was not specifically discussed in Mr. Fountain's case. [DE 91-16 at 49]. The decision to terminate Mr. Fountain was not made solely by Mr. Josza but rather was a joint decision between human resources, compliance, and him. *Id.* at 43. Mr. Fountain does not assert that Mr. Josza was involved in the decision to deny his benefits or in the subsequent administrative appeal. "Other than completely unfounded speculation," Mr. Fountain has presented "no real evidence whatsoever that would allow for the conclusion that a contributing factor" to Zimmer Biomet's termination of Mr. Fountain was "a desire to frustrate [his] attainment or enjoyment of [these] benefit rights" because of his job opportunity at SINA or

recruiting dinner. *See Johnson v. Roehl Properties of Indiana LLC*, 2012 WL 1144027, at *10 (N.D. Ind. Apr. 4, 2012) (citing *Teumer*, 34 F.3d at 550). Accordingly, this argument also fails.

Fourth, Mr. Fountain argues that Zimmer Biomet's "selective enforcement" of the entertainment of healthcare providers policy is also evidence of pretext. Selective enforcement or investigation can be evidence of pretext because "evidence of selective enforcement of a rule 'calls into question the veracity of the employer's explanation.'" *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (quoting *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001)); *Harden*, 799 F.3d at 866. Mr. Fountain has the burden of showing other employees were similarly situated to him and treated more leniently. Similarly situated employees "must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Coleman*, 667 F.3d at 846 (internal quotations omitted). The Court is looking for "comparators, not clones." *Id.* "[T]he critical question is whether they have engaged in conduct of comparable seriousness." *Id.* at 851. Whether an employee is "similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'" *Id.* at 846–47 (quoting *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)).

With this legal standard in mind, the Court turns to Mr. Fountain's proposed similarly situated employees—Bryan Almeida, Mr. Josza, and a handful of employees on the 2013 emails reviewed during Mr. Fountain's investigation. Mr. Almeida, an employee of Zimmer Biomet until 2017, indicated that during his time at Zimmer Biomet, he played golf with other sales representatives in management positions and healthcare providers, and each person paid for themselves. [DE 91-18 at 3]. Around March 2016, a few weeks after the San Diego conference, Mr. Almeida was interviewed by Mr. Henry to discuss the round of golf he played with Mr.

Fountain and healthcare providers. *Id.* Mr. Almeida attests that Mr. Henry told him he violated the compliance rules by "sponsor[ing]" the golf outing in San Diego. *Id.* Mr. Almeida had no further communications regarding the golf outing, never provided Zimmer Biomet with any documentation, such as receipts, and was not disciplined or terminated for playing golf with healthcare providers in San Diego. *Id.* at 3–4. Mr. Fountain additionally submitted evidence that Mr. Josza made arrangements to play golf in San Diego with healthcare providers. [DE 91-23 at 2]. Further, in the 2013 emails reviewed in the compliance investigation, several other Zimmer Biomet employees, including Mr. Almeida, were involved in arranging golf with healthcare providers. [DE 91-23 at 8–24]. Mr. Fountain attests that the employees on these emails were still employed by Zimmer Biomet at the time of his termination. [DE 91-1 at 15].

The Court does not find Mr. Fountain has met his burden here. Zimmer Biomet argues that Mr. Almeida is not similarly situated to Mr. Fountain because Mr. Almeida did not provide a letter to the IRS stating he had unreimbursed business expenses relating to entertaining clients and there is only evidence he violated the policy once. The Court agrees. This distinction is also true for Mr. Josza and the other employees included in the 2013 emails. The severity of Mr. Fountain's violations is more egregious and distinguishes him from employees who also golfed with healthcare providers. The letter he sent to the IRS suggested he had paid for healthcare providers' golf and when confronted with the allegation, was uncooperative and failed to substantiate his claims with receipts, as required by the policy. The evidence before the Court does not suggest any other employee is similarly situated to Mr. Fountain in that regard. Additionally, the 2013 golf emails that included Mr. Almeida were either initiated to him by Mr. Fountain or the round of golf discussed ultimately did not occur. [DE 91-23 at 13, 21]. Further, Mr. Fountain has failed to submit evidence that Mr. Josza violated the policy on more than the

one occasion. Nor has he established that Zimmer Biomet was aware of this violation but did not discipline Mr. Josza, which is necessary to establish Zimmer Biomet selectively enforced its policy.

Additionally, where courts have found selective enforcement can be evidence of pretext, they have also found other evidence supporting pretext to the employee's termination and viewed that evidence together. *See Baker v. Macon Res., Inc.*, 750 F.3d 674, 677 (7th Cir. 2014) (finding evidence of selective enforcement combined with other inconsistencies in the evidence supported pretext); *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010) (considering evidence of a disparity in treatment in light of the evidence that the employee's investigation was "unusual and limited"); By contrast, here, there is nothing to suggest pretext— no evidence that the investigation was initiated or conducted in bad faith, that its findings were not the true basis for Mr. Fountain's termination, that the proffered reasons for his termination had flagrant inaccuracies and inconsistencies, or that Mr. Josza wanted to interfere with Mr. Fountain's benefits. *See Harden*, 799 F.3d at 866. The Court also notes that Mr. Fountain's argument regarding selective enforcement is especially limited and thus has waived arguments not otherwise raised. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("It is a well-established rule that arguments not raised to the district court are waived on appeal.").

Accordingly, the Court finds that Mr. Fountain has failed to sufficiently establish that a reasonable factfinder could infer Zimmer Biomet's asserted reasons for his termination were false or a lie, and therefore pretextual. The Court grants Zimmer Biomet's motion for summary judgment as to Mr. Fountain's interference of benefits claim in Count II.

### C. Count III – Breach of Contract

In Count III, Mr. Fountain alleges that Zimmer Biomet breached his Agreement when it did not pay him non-competition period payments after Mr. Fountain was denied full-time employment solely because of the restrictive covenants in the Agreement. Zimmer Biomet argues that summary judgment is appropriate because no material facts are in dispute and since Mr. Fountain was found ineligible for severance benefits, a condition for non-competition period payments, no breach of the Agreement occurred. Mr. Fountain argues that because there is evidence that Zimmer Biomet did not have cause to terminate his employment and he was entitled to severance benefits, he was also entitled to non-competition period payments.

The Court's jurisdiction on this claim is based upon 28 U.S.C. § 1367, which provides for the exercise of supplemental jurisdiction over a state law claim that is closely related to the federal claim in a case. A district court "may decline to exercise supplemental jurisdiction" over state-law claims if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "Although the decision is discretionary, '[w]hen all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims.'" *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) (quoting *Al's Serv. Ctr. v. BP Prod. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010)). "The presumption is rebuttable, but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Id.* (internal quotations omitted). A district court exercises significant discretion in determining whether to retain such pendent claims, based upon "the principles of considerations of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988). Given these principles, "when all federal claims are dismissed before trial, the district court should relinquish

28

jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir.1994). However, courts have recognized three exceptions to this general rule: when (1) "the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court"; (2) "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort"; or (3) "when it is absolutely clear how the pendent claims can be decided." *Id.* The Court finds the latter two exceptions are applicable in this case. Here, the parties have fully briefed Mr. Fountain's state law claims, and this Court is intimately familiar with the details of the case, which commenced in April 2017. Requiring the state court to address these claims would cause a substantial duplication of effort. Additionally, as Zimmer Biomet notes in its motion, remanding the claim would have a boomerang effect, because at the time Mr. Fountain filed his lawsuit, the Court had diversity jurisdiction over the state law claim independent of any federal question. Lastly, the Court finds it is clear how the pendent claim can be decided. For these reasons, the Court elects to exercise supplemental jurisdiction over Mr. Fountain's state law claim.

The parties agree that Indiana law controls the Agreement and Indiana law relating to contracts is well established. To prevail in a breach of contract action, a plaintiff must prove: 1) a contract existed, 2) the defendant breached the contract, and 3) the plaintiff suffered damage as a result of the defendant's breach. *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007). The goal of contract interpretation is to ascertain and give effect to the parties' intent. *Id.* at 372 (citing *Berkel & Co. Contractors v. Palm & Assocs., Inc.*, 814 N.E.2d 649, 657 (Ind. Ct. App.2004)). In interpreting a written contract, the Court will attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their

rights and duties. *Id.* "Contracts should not be so narrowly interpreted as to frustrate their

obvious design or so loosely interpreted as to relieve a party of a liability fairly within the scope

of the contract's terms." *Anderson v. Horizon Homes, Inc.*, 644 N.E.2d 1281, 1290 (Ind. Ct. App.

1995) (citing *Radio Picture Show P'ship v. Exclusive Int'l Pictures, Inc.*, 482 N.E.2d 1159, 1167

(Ind. Ct. App. 1985)). Here, neither party disputes the existence of a contract. Thus, the Court's

analysis will turn on the breach and, if necessary, the damage elements.

On May 31, 2016, Mr. Fountain received a letter from SINA, a competing business of

Zimmer Biomet, confirming the terms of his offer of employment. [DE 1 ¶ 40; 82-11; 82-8 at

45]. The offer letter set forth Mr. Fountain's salary, benefits, as well as other terms, and

confirmed receipt of his non-competition Agreement with Zimmer Biomet. [DE 82-11 at 3–4].

The letter acknowledges Mr. Fountain's representation that he will abide by the terms of the

Agreement, and that SINA reserves the right to rescind the job offer if it concludes the

Agreement would impair Mr. Fountain's ability to perform the job. *Id.* at 4; [DE 82-8 at 46]. Mr.

Fountain did not accept the offer as detailed in the letter from SINA, however, he was hired by

SINA as a consultant outside the United States. [DE 82-8 at 33–35].

Section 9(a) of the Agreement states:

> In the event of Employee's involuntary separation from Employment with the
> Company and eligibility for benefits under the terms of the Company's Severance
> Plan, then to the extent Employee is denied, solely because of the restrictive
> covenant provisions of Section 7 of this Agreement, a specific full-time or part-
> time employment, consulting, or other position that would otherwise be offered to
> Employee by a Competing Organization, and **provided Employee satisfies all**
> **conditions stated herein**, then upon expiration of Employee's Severance Benefit
> Period, Company will make monthly payments to Employee for each month
> Employee remains unemployed through the end of the Restricted Period.

[DE 91-2 at 7] (emphasis added). This provision goes on to state: "This Section 9 will not apply

if Employee leaves employment with the Company voluntarily or **if Company terminates**

**Employee's employment for a reason or reasons that render Employee ineligible for benefits under the terms of the Company's Severance Plan**." *Id.* (emphasis added).

Neither party appears to dispute the clarity of the contract, nonetheless, the Court finds the Agreement between Mr. Fountain and Zimmer Biomet to be unambiguous. In order for Mr. Fountain to be eligible for non-competition payments under Section 9 of his Agreement, among other things, he would have needed to also be eligible for severance benefits under the terms of the Plan. Mr. Fountain argues that Zimmer Biomet breached the contract because it did not have cause to terminate his employment and he was entitled to benefits under the Plan. However, as the Court has previously discussed at length, Mr. Fountain was found ineligible for severance payments under the Plan because he was terminated for "[w]illful misconduct or activity deemed actually or potentially detrimental to the interests of the Company" such as "violat[ing] one or more Company policies" and "[a]ny act or omission causing, or having potential to cause, significant harm or loss to the Company[.]" [DE 82-2 at 13; 91-12 at 2]. The Committee's decision to affirm Mr. Fountain's denial of severance benefits was rationally supported by the administrative record before it and the Court does not disturb that decision.

Given the clear terms of the Agreement and the undisputed facts before the Court, Mr. Fountain cannot prevail on his claim that Zimmer Biomet breached the contract by not paying him non-competition payments as he was not entitled to them under the Agreement. Alternatively, Zimmer Biomet argues that even if Mr. Fountain were eligible for non-competition payments under the Agreement, his claim would still fail for other reasons. However, the Court need not reach those arguments as it finds that based on the undisputed facts, Zimmer Biomet did not breach its contract with Mr. Fountain because he was not eligible for

non-competition payments. Accordingly, Zimmer Biomet's motion for summary judgment is granted as to Mr. Fountain's breach of contract claim in Count III.

## IV. CONCLUSION

For the foregoing reasons, Defendants Zimmer Inc. and Zimmer Biomet Holdings Inc. Restated Severance Plan's motion for summary judgment is GRANTED as to all counts. [DE 80].

SO ORDERED.

ENTERED: May 20, 2021

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court